et al. Appellee, Michael Pujawa. Thank you. Good morning. May it please the court, counsel, my name is John Spatia and I'm here to on behalf of the plaintiff appellant in this case, Nancy Anello, along with my co-counsel here, Jake Gancarsik. This is a dental negligence case. And in a 2014 decision called Charbonneau v. Hilborn, this court recognized that in a medical negligence case we are presented with a classic battle of the expert witnesses called by the plaintiff were in fact independent experts. They were subsequent treating dental practitioners from the University of Iowa who began treating Ms. Anello after the implants, the dental implants that were placed by the defendants had failed. The expert witness for the defendant was a Dr. Rowe, the defendant was negligent in one or more of the following respects. That list includes, quote, dental implants were misplaced and improperly placed into the incisive canal and the nasopalatine nerve. The list also included, quote, dental implants were misplaced and improperly placed into the incisive canal and the dental implants were misplaced and improperly aligned in the maxilla. And from the inception of this case, from the complaint, the 622 affidavit found at the common law record, page 4, 5, 8, and 13, extensive bone loss resulted from the negligence, extensive bone loss in the maxilla that reached levels of 80% bone loss. And so the issue, the heart of the case on causation was, was that bone loss, was the dental implant failure a result of negligence or, as the defense suggested here, this synergism. The defense expert says, quote, I think it was a synergism of her medical health. She had osteopenia, she has xerostomia, she has a number of arthritis, but certainly explain why they failed. That was the heart of the case. The reason we're here is because of evidentiary errors. Evidentiary errors that were highly prejudicial that went to the heart of the case that addressed all three of those issues that were at the heart of the case. Evidentiary errors that were highly prejudicial that went to the heart of the case that addressed all three of those issues that addressed all three of those issues. And so I'm going to start with the use of the skulls. The use of these Exhibits 71 and 72 in this case, which was a human skull and model skull, violated virtually every ruling of this court in this case. Question, was it disclosed? Answer, no. We are just using this as demonstrative opinion. The first thing that we're going to... If that's the case, then there's no need to disclose, is that correct? Pardon me? There would be no duty to disclose, would there? Well, first of all, there's no such thing as demonstrative opinion. Well, no. And that starts with the fundamental misunderstanding of the rules of evidence right there. But the court's right. If these were purely demonstrative, if they had no probative value in and of themselves, then that's right. There would be no need to disclose. And that's not what happened in this case. The stated purpose of the skulls at page 1619. Counsel explained in the trial court the purpose of the skulls. Quote, These are demonstrative exhibits, and he, the expert, is going to show that the angulation of the skull that he has presented to the jury, the angulation of the teeth, is nearly identical to the angulation of the teeth on Nancy Yanello in Nancy Yannello's cephalometric x-ray, demonstrating that the implants in Miss Yannello, that they were placed in Miss Yannello appropriately placed. That was the use of the skull. To show that, pardon me? That was the justification for using the skull. That's right. And you're saying that that takes it out of demonstrative. Absolutely. In fact, it takes it exactly out of demonstrative. So, if I could, that's the first explanation of the use of the skull. That goes to the angulation. The second explanation of the skull, and I think this is interesting, even in their appellate briefs, they're describing use of the skull that is a direct violation of Charbonneau. They say at page 12 of their appellate brief, Dr. Panamitros uses the skulls to, quote, demonstrate how hypothetically the angle of the x-ray can make it appear that an implant is in the nasopalatine canal when it is not. They used the skull, and they compared it to the cephalometric x-ray. Just like in Charbonneau, the treatise was used to discredit or to explain or to undermine an actual x-ray. This is what they did at trial, and it's clear. It's clear in their appellate brief. It's clear in the record. So you're analogizing that, as in Charbonneau, the skulls were the treatise. That's right. Okay. If we move on in this case, and the use of the skulls addressed each one of the three issues. They used the skulls to discredit the cephalometric x-ray and to establish proper angulation without any foundation for the skulls, without them ever having been disclosed. They then used the skulls to discredit the x-ray showing impingement on the nasopalatine canal. They then used the same skulls to discredit the actual x-ray showing a perforation of the maxillary sinus by one of the implants. I would submit exactly, exactly what happened in Charbonneau in a direct violation of the rules. This was not demonstrative evidence. And if there was any question as to whether this went to the heart of the malpractice case, we need only look at the closing argument of defense counsel. Quote, I mean, all you have to do is put your finger in your mouth and feel the angulation of the jaw as it goes up and it goes in. Anyone who's seen a skull, I think you saw it for the first time, I think you saw it for just a couple minutes here, shows the curvature of the jaw. Of course, you have to put the implant in where there's bone there. I guess we have to ask ourselves, if this was purely demonstrative evidence, why is he talking about it in his closing argument? Why in the closing argument does he relate the skull? Does he say that the skull establishes, he says, quote, the skull shows the curvature of the jaw. No, it doesn't. There was never a foundation that the skull showed the curvature of Nancy Yanell's jaw. I have submitted to the court that there is no, there was never an explanation of why these were not produced. It's clear that these were used as demonstrative, not used as demonstrative evidence, but instead that they were used as having probative value in and of themselves. To discredit x-rays of the plaintiff, to establish proper angulation of teeth, natural teeth, and thus implants. The second issue here is this use of the code of ethics. And as the court knows from the briefs, this American Academy of Oral and Maxillofacial Surgeons has a code of ethics. And what they do in their code of ethics is they say that an oral surgeon must not serve as an expert witness. They do permit him to serve as fact witnesses, but have a specific line, a specific statement that should be read if a fact witness, an oral surgeon, is asked about testifying at trial. I've submitted to the court that, and we've cited the Poole decision out of the First District Appellate Court, the disciplinary charge against an expert is not material. This is akin to a disciplinary charge. It's actually, that doesn't even rise to that level. But this is not material, this was not relevant. The justification for this was that it went to credibility. That's what they say at page 1267 of the report of proceedings. I would submit to the court these rules that are created by the special interest group had nothing to do with the bias of Dr. Burton. They did not show that he had an interest in the case. They did not undermine his opinions or his qualifications or the basis of his opinions. Under Poole, they clearly were not admissible. They were not relevant. Dr. Burton even went on to explain that these rules didn't even apply because it applies to colleagues. He was an oral surgeon. The defendant in this case was a dentist. Again, any question that it went to the heart of the case, we need to only look at the closing argument. Quote, Dr. Burton was not even supposed to be here testifying according to his rules, his code of conduct. The jury was told he knew he wasn't supposed to be here.  I would submit to the court that the idea that a special interest group can either muzzle its members from testifying or that a special interest group can provide what testimony should be stated in open court when we have patients who have been injured by negligence is void against public policy. It should be rejected by this court. I want to touch on the use of rheumatoid arthritis and the suggestion that rheumatoid arthritis was somehow a cause of implant failure. And the backdrop of this issue of rheumatoid arthritis is particularly troubling. What was established at trial is that there was no foundation. There was no basis to say that Nancy Nell even had rheumatoid arthritis. Again, page 1640, the report of proceedings. Counsel for the defendant described rheumatoid arthritis in his own expert's opinions like this. He says, quote, he is not diagnosing it. It's his opinion. The trial court found that Dr. Panamitro's, quote, can't treat it and he can't diagnose it. Trial court also prohibited the use of the Christie Clinic records as substantive evidence because there was no clear indication that there was a diagnosis. There was also testimony at trial from the only medical doctor who testified in this case. That's Dr. Gandhi. And here's what Dr. Gandhi said under oath. He said, quote, Nancy Yanemo does not have rheumatoid arthritis. It's with that backdrop that the court allowed testimony from the defense expert witness, a dentist in this case, that he says, quote, of rheumatoid arthritis. Quote, it's an autoimmune disorder. It's like lupus. It's an autoimmune disease where the body attacks itself. The body is attacking the synovium of the bone. It's basically attacking itself. The body's immune system turns on itself. The body just attacks itself. With rheumatoid arthritis, it's just the body attacking itself. Six, seven, eight times he talks about the body attacking itself. Why? Right to the heart of the case. The bone loss here, according to the defense, was not a result of negligence. It was a result of a combination of things, including this rheumatoid arthritis where the body was attacking itself. I would submit to the court with medical testimony that the plaintiff did not have rheumatoid arthritis. No reasonable person could have allowed that type of testimony. No reasonable person could have allowed this theory of a synergy or a synergic effect of medical conditions that included rheumatoid arthritis to be used as a defense in this case. In the Christie Clinic records, was there not reference to the plaintiffs having rheumatoid arthritis? The reference, the closest that anyone could ever get in the Christie Clinic records was that there was some kind of, it says, assessment. No one knows whether that meant a diagnosis. No one knows whether that was just something that they were considering. But what's interesting here is, on questioning from the court, the defense could not even identify a single medication that the plaintiff was taking for rheumatoid arthritis. And her own geriatric specialist testified she did not have it. The defense in this case had ample opportunity to get a medical doctor to come in and testify that she had rheumatoid arthritis and they never did it. And I submit the reason is because they couldn't. The last issue that I want to touch on is the issue of sanctions. The notice of appeal in this case is contained in the appendix at page 74. And it is indeed an appeal from the order that denied the post-trial motion and also denied our motion for sanctions. And I would submit to the court that the court needs to stop these tactics at evidence depositions, these obstructive tactics. They are a waste of money. They are a waste of the court's time. And in this particular case, it cost the plaintiff thousands of dollars, 250 objections at an evidence deposition. And we provided some of these objections to the court. I asked the question, in connection with your teaching dental students, did that teaching include the subject of dental implants? Objection leading. And it's just repeated, 250 objections. Twenty-nine percent of this deposition was redacted by the trial court. And it took hours to go through those 250, I submit, frivolous objections. It's obstructive. It interferes with the presentation of the case. Sanctions are warranted in this case. We've asked that this court enter relief that it believes is just. My position is, 29% of the deposition was redacted. Twenty-nine percent of the cost should be borne by the defendant. We're here today asking this court for a new trial. We're here today asking this court for a fair trial, one that will be free of these prejudicial evidentiary errors. Thank you very much. Okay, thank you. Let's visit Mr. Kujawa. Good morning, Your Honor. May it please the court, counsel, again, Michael Kujawa on behalf of the defendants, Epeliz, Park Family Dental, and Dr. Rowe. I think it's important to remember here that in each of the three issues plaintiff raises on appeal, the standard is abuse of discretion. And if I look at the record, it clearly supports the trial court's decisions on each of the three main issues. The use of the skulls as demonstrative evidence, the cross-examination of plaintiff's expert with the AA OMS code, and the opinions that rheumatoid arthritis and osteopenia contributed to cause the plaintiff's implant failure. And I put to you, there's simply no way that one could say that the trial court's rulings on those three issues were, as the standard is, arbitrary, fanciful, or unreasonable. You know, when you used the skulls to show that they related to the plaintiff's teeth, and that was a direct comparison, you were comparing this skull not as showing there are teeth and there's a skull here, but you're using it in part as the basis for the opinion that was given. Isn't that right? No. Actually, Your Honor, what we did was all of the opinions, were given well before those skulls ever came out. Those opinions came in without objection. Dr. Paneritos testified about the proper placement of those implants. The fact that you have to put the implant... I'm not talking about that. I'm talking about using the skull and saying, you can see right here how the angles are and so forth and so on. Isn't that different? I don't believe it is, Judge. It's no different than a counselor just talked about, the model that we used the skull to show the curvature of the maxill. That's no different than a doctor holding up a model of the spine and showing the curvature of the spine, showing where the various nerves come out, where the various levels of disc come. All Dr. Paneritos did with the skulls was hold them up because what we had was 1D images on x-rays, flat pictures up on the screen, and what he was trying to show in demonstrating and explaining his opinions to assist the trial effect in understanding his opinions was hold up the skulls and say, you have to understand, ladies and gentlemen, this is a skull, okay, and the standard for demonstrative evidence is the object... You don't have to go into that. I know the standard for demonstrative evidence, but in this case he used the skull to say this is what was happening, as if it was the plane of the skull. But there was talk of doing that, and all the quotes that counsel just made from the record regarding things that we had said as defense counsel in this case are quotes from sidebars. There was extensive sidebar argument on this issue when the skulls came out, and there was talk about what could be done and what could not be done with the skulls, and that's why I talk about any of these decisions. No one can say they were arbitrary, fanciful, or unreasonable. Judge Petrangala spent a lot of time analyzing the arguments of counsel, the case law involved, and what was going to be done, and she laid out, we made it clear, Judge, we need to know what we can do with these skulls, and she said you can lay a foundation for them that they purport to show what they are, and that's what Dr. Panamitros did, and then you can use them to explain and demonstrate what your opinions are regarding why the plaintiff's experts... Let's back up. What did the doctor show the skulls were, the skull that was supposed to be like the plaintiff's skull? Well, he never said that the skull was like the plaintiff's skull, and in fact, that would be impossible. There's never going to be a model that's going to be exactly like any individual plaintiff or injured person's body part. So how do you have the testimony that this is the way the angle is and this is the way the implants are going to go in? Well, there's basic anatomy, which is the way that the skull in general, all skulls are going to be shaped. It's a human skull. There are similarities, but it's not... But the skull was used as a basis for the opinion that this was okay because, look, here's the skull. It was not used as a basis for the opinion. This is a far cry from the Charbonneau case, where they took treatises from a medical document and put them up on a... created a slideshow presentation, created real... They took images from the treatise. They didn't put the treatise up. They put images. They took, yeah, images from the treatise up next to the images taken from the plaintiff right next to them. And then they had the citations of the treatise itself. They had captions up above saying this is a non-cancerous lymphoma, whatever it was, and the one next to the plaintiff. That's not what happened here. What happened here was Dr. Kandemitrous testified to his opinions. He testified that Dr. Rowe placed those implants where there was bone available in the maxilla, and it is... You can do it. Anybody can. When you put your finger in your mouth, you can feel that there is an angulation to the maxilla. That is basic anatomy. What he was showing with the skull was essentially that what they're claiming happened here, that there were implants placed into the nasal palatine nerve or into the maxillary sinus. Those x-rays don't necessarily show that because you're looking... When you look at the 3-D image of the human skull, whether it's a model, a general skull, or the real skull that he brought in, you can see that when you look at the x-ray, it's only taken one part, and depending on the way you look at it, it's not going to catch the angulation in a human skull. But he never once attempted to say that this was a replica of Nancy Anello's skull. That's why this was... These were used for demonstrative purposes only. Did he not say, though, and maybe this goes to support your point, that in the majority of cases this is the skull, is the majority? Sure. That's how you end up with a model skull. Just like the model maxilla that Plantis Expert used in his examination, he said this is essentially the general or standard or normal maxilla that you're going to have in a person. That's the same thing we have with the skull here. And that is why it is demonstrative evidence only, and certainly not substantive evidence or real evidence, and goes to the reason why it did not need to be disclosed pursuant to Rule 213, because demonstrative evidence does not need to be disclosed. This happens in medical cases all the time. And there was absolutely nothing improper or untoward done by Dr. Peronitos in using the skull, not as a basis for his opinion. He didn't need it as a basis for his opinion. His opinions had come in long before those skulls ever came out. What he was using it for was to assist the trier of fact in understanding the opinion and to demonstrate what those opinions mean. And it's a far cry. So it's not the Johnson case involving a photo recreation. It's not the Lorenz case where they did essentially a reenactment of the accident itself. And it's certainly not the Charbonneau case where they created real evidence in that PowerPoint presentation. This is a very standard, very basic use of demonstrative evidence with the two skulls. What was he attempting to demonstrate with that skull? Was it that you had a 1D image of x-ray and trying to say that the 1D image doesn't show the angularity? What he was trying to show was that there in the human skull, in the generalized human skull, there is angulation in the maxilla. And when you are placing implants, you have to use the bone that is available in that implant. And in every patient it's going to be different. And that's why when you look at those x-rays, the x-rays don't tell the full story. The x-rays show one image taken at a one-dimensional angle and not the three-dimensional angle as you can see with a human skull. He could have stood there and said, look at my head. Look at any of our heads. And you can see the natural angulation. You can see the way the head, the human head is shaped in general. It would be no different than the maxilla model that a plant expert used or the skulls that he brought in there. But it certainly was not the basis for his opinion requiring disclosure. And it was used after a great deal of argument and contemplation by Judge Petronaro and direction essentially saying this is what he can use the skull for and that's it. And that's all that the skull was used for. So the idea that somehow this is, certainly it's not Charbonneau, it's not Johnson, it's not Lorenz, it's much more like Preston versus Simmons where they talked about the distinctions between a model skeleton and an actual skeleton. That goes to the weight. You could cross-examine that all day long, but that goes to the weight of whatever they're using that demonstrative evidence for, not its admissibility. Certainly this is admissible demonstrative evidence. And it's done in courtrooms. Somebody's doing something like this in a courtroom right now, someone in the state because it's done every day all the time. And it was done properly in this case. And certainly Judge Petronaro's rulings were not arbitrary, fanciful, or unreasonable in this or in the other two issues. And when we look at what the standards are on abuse of discretion, where is the prejudice? Where is the substantial prejudice which affected the outcome of this case? I have not heard it. It's not in the brief. Other than they lost the case. But all of this evidence came in and would have come in whether or not those skulls were used. Those opinions came in regarding the angulation, all came in, that all of Dr. Peña Nieto's testimony was coming in. When we talk about, I've answered your question, but I'd like to move on for a minute now to the second issue, which would be the cross-examination of Dr. Burton with the code of conduct from AAOMS. And the difference here, counsel, sir, well, this is. I have a question because you say all of this would come in, so if there was no skull presentation in this trial, everything else of the opinion would be in. Is that correct? It all came in well before the skulls were ever brought out. Don't you ever ask yourself as a practicing attorney why you even bother with them? Well, why? Because I'm trying to assist the jury in understanding the case. We're always trying to assist the jury in seeing our side of the case. That's all elaborate. To assist them in understanding, it's always an attempt to get the jury to see your side of the case. It certainly is. But I don't know that, I mean, could we have won this case without the skulls? Yes, we would have won the case without the skulls. I don't think the skulls had any effect. They were hardly used. Which goes to your prejudice, I hear. Right, there is no prejudice. All those opinions came in well before the skulls ever came out. The skulls were used to show that the implants were properly put in based on the angle of the skull. And you compare that to the plaintiff's skull. You said to her, to the x-ray. To what was needed to be done. The only thing the skulls were used in relation to the x-rays was to show that when you look at a 3D object and you compare that to what can be shown in an x-ray, it's not going to show the same thing. So depending on the angle of the x-ray and you see an implant there, you can't see in the 3D image where exactly that lines up with the nasal palatine nerve or the maxillary sinus. You mean in the 1D image? In the 1D image, yes. You can't tell. So depending on the angle of the image, you're not able to see exactly what plaintiff's experts have already testified to. Well, this x-ray shows that this implant was placed into the nasal palatine canal or into the maxillary sinus. So that's what the skulls were used for, to show, to explain the opinion that these implants were properly placed. Not as a basis for the opinion. It was a demonstrative opinion to show to the jury what a skull looks like and the shape of the skull. It's just like the shape of a spine or a knee or a hip or an elbow or a shoulder or any other part of the anatomy. Does every skull have the same bone structure? Not every skull has the same bone structure, no. But that's not what Dr. Peña-Mitros was testifying to. He wasn't saying that this particular skull and Nancy Inola's skull were identical or that the bone mass in the maxilla in this skull and Nancy Inola were identical and that, therefore, the placement of the implant into Nancy Inola, just like I'm showing you, the placement of an implant into this would have been identical and would have met the standard of care. He never said any of those things. He said that the dental implants could not have been placed in different angles because of the very, very thin bone structure present in the anterior maxilla. That's medical testimony by a doctor of dental medicine. And the dental implants were properly angled all the time using the skull? No, but it wasn't all the time using the skull. Like I said, those opinions were testified to long before the skulls ever came up. Those opinions were part and parcel of Dr. Peña-Mitros. Didn't they reinforce the jibbing that the jury might have had? Wasn't that part of the purpose of the jibbing? Well, part of the purpose of demonstrative evidence is to explain to the jury so they understand what your testimony is. So certainly it wasn't just, we didn't just put a skull out there because people, because nobody's familiar with the size or shape of the human head. I mean, he used it to demonstrate what his testimony was, to aid the trier effect in understanding. Hypothetically, let's say the skull was never introduced, okay? But you said that on the stand the doctor pointed to his jaw, and that demonstration itself, is that the purpose of the skull? I mean, I guess trying to articulate this, if the doctor on the stand had turned to the jury and said, here, feel your own jaw, whatever, and see there's angulation, and that bone is thinner in the ancillary area, would that be objected to in your view, or would that be just part of demonstration? Well, it wasn't objected to in this particular case when he did talk about feeling the bone up inside there. It wasn't objected to in closing arguments. Well, isn't that demonstration? It is demonstration, and there's nothing wrong with it. It's just like in a case where an elbow, where a doctor will say, well, you know, the elbow bends this way and this way, and they'll demonstrate the way it's working. So you're saying that the model, the two skull models, was doing the same thing as what he could have said orally from the stand to the jury. And he did say orally to the jury. Well, I know he did. But you're saying that. Yes. So at best, your argument is, or criticism would be a pecuniary. Certainly not something that rises to the level of substantial prejudice affecting the outcome of the case. Yes. At best, cumulative. So that's two minutes. There's really no effect on the outcome of the case. And when you look at the reasoning and analysis done by Judge Petrangaro, no one can say that it was arbitrary, fanciful or unreasonable. Excuse me. Can you move on to the second issue? Sure. When you say the second issue, you're talking about Dr. Burton and the cross-examination of the rheumatoid arthritis. Dr. Burton. First of all, Dr. Burton, in the very beginning of my cross-examination of Dr. Burton, he laid the foundation for the code of conduct as being applicable and something that he must comply with. So this is a far cry from the pool case where they wanted to cross-examine on a disciplinary charge, and the doctor denied that that disciplinary charge ever happened and that it was legitimate. Dr. Burton didn't deny that. He wanted to, on redirect examination, come back and say, well, here's why it doesn't apply. But he was the one who laid the foundation for the applicability of the AAOMS code of conduct. And he agreed. He had to follow that. And in terms of this being some sort of a collateral issue, Dr. Burton was both a treater in this case and an expert witness. And that's where the problem comes in with the AAOMS code of conduct. It says you're not supposed to play both roles. If you're a treater, that's where your testimony stops. So the idea that there's some governing body out there that's preventing dentists or oral surgeons from providing testimony in this case is ludicrous. He could have provided all the testimony he wanted regarding his role as a treating doctor in this case. But our theory of the case was that it wasn't anything that Dr. Rowe did that violated the standard of care. The treatment he gave was proper and adequate. It was the treatment given to her when she went to the University of Iowa and was treated for her maxilla by Dr. Burton, Dr. Schneider, and Dr. Ludwig that caused her problems. And so that's why apparently for Dr. Burton it wasn't enough to just testify about his treatment. He had to come in and provide expert opinions, pointing the finger at Dr. Rowe. So the cross-examination of Dr. Burton was perfectly acceptable. And there's no reason we would have to disclose that in advance either. 213, just like it doesn't apply to demonstrative evidence, also doesn't apply to what we're going to do in cross-examination of an expert. We are given wide latitude and has the discretion to decide whether cross-examination is proper. And there was absolutely nothing improper about cross-examining Dr. Burton with that code of conduct. Can you establish in a profession a code that says you're prohibited from giving any testimony at a trial with regard to a professional negligence case, a mob practice case, so therefore anybody who is allegedly injured or wronged by this profession can't find a witness because they're not allowed to testify based on that individual profession's rules of conduct that say, look, none of our people, and you belong to this when you have these credentials, it's improper, unethical to be an expert witness in a case. Is that what you can do? Well, I think your question presumes what you can do is what the AAONS did in this case and say it can't have both roles. You can testify as a treating doctor if you're a treating doctor. That's fine. You can testify as an expert witness. And certainly they could have found an expert witness. Where does the rules say that? It says it in its... As I recall, it's not quite that specific. What it says under G.1.08A6 is oral and maxillofacial surgeons who wish to serve as expert witnesses must not do so in cases for which they also serve as one of the patient's treating doctors. This qualification does not preclude a treating oral and maxillofacial surgeon from serving as a fact witness testifying from first-hand knowledge about the condition of a patient and the treatment provided. If, during the course of testifying, the fact witness is asked his or her opinion about a particular matter, it is appropriate to remind counsel that the witness is not testifying as an expert oral opinion witness. Dr. Burton certainly could have and did testify extensively about the treatment that he provided, his role as a treating oral surgeon with Ms. Grinnell. But as soon as he was asked, okay, now after that, I want to ask you some questions about Dr. Rowe and about his treatment and whether you think that was within the standard of care. That's when he had an obligation, according to this code of conduct, which he says applies, to tell the questioner, I can't do that in this case. I have to draw the line here. You're going to have to go get an independent oral surgeon if you want those opinions. In other words, even though our law of evidence allows people to cross-examine and even elicit opinions from treating physicians in cross-examination, their group can stop that. Does the law of evidence prevent someone in cross-examination from asking a treater if they have an opinion? The law of evidence doesn't prevent it. Just like I was able to cross-examine Dr. Burton on his violation of the code. He can come in and testify. What trumps the law of evidence in these expert fights is an association that says our people can't do that. So we don't care what the law says. You can't do that. I don't think it trumps the law of evidence. I think it would have been an interesting scenario if they had not elicited opinions from him on direct examination. All he testified about was as a treating doctor. Can I finish my answer here? And then under cross-examination, I had tried to elicit opinions from him, and then he raised this issue. Now then we would have a question whether he has to answer those questions or whether he could say, I can't answer those questions because my code of conduct prohibits me from doing so. But that's something we certainly would have found out about earlier on in this case. That wasn't the case here. They disclosed him early on as an F2 treating doctor and an F3 opinion witness who would provide opinions against Dr. Rowe. And he came in, obviously this didn't prevent him from providing testimony. He provided testimony on both prongs. He did. And so you attempted to impeach based on this code. I attempted to impeach his credibility, his bias, his interests, his prejudice as an expert witness in this case using the code of conduct that at the very beginning of his cross-examination said he had to comply with. And he didn't. So you told the jury that he's unethical. I did not tell the jury that he was unethical. Well, I mean, the implication is he violated their group's ethics code. Either he violated the group's ethics code knowingly or he didn't know about it, yet comes in here and claims that this is the document that he works under. Either way, it goes to his credibility. He is the one on direct examination who pointed to Dr. Panamitros' opinions in this case and said they were a fabrication. So as a cross-examiner of an expert witness, I certainly get to test that particular witness's credibility. Well, there's no doubt you can test his credibility. What I just wonder about is can a group make an ethics rule like that to trump the rules of evidence? What can and can't be done with regard to these expert fights and these trials? And then using that evidence in the future. Well, I think the fact that – and I didn't know what he was going to say when I started cross-examining on this. He may have said, no, this has no implication for me. It doesn't matter in the state of Illinois. It's only in this state. He could have given me any answer. What he said was, no, I have to comply with this. Now, he obviously didn't comply with it. He did not refuse to testify on behalf of Nancy Anello. He did not limit his testimony in any way, shape, or form on direct examination regarding the opinions he intended to give. He gave all of those opinions, blaming Dr. Rowe for what he claimed was an implant failure and negligent treatment in this case. Thank you very much. Thank you. Good job. Mr. Spitzley. I actually welcome the opportunity to mitigate this issue of whether this American Association of Oral and Maxillofacial Surgeons can inject itself and add new rules for plaintiffs in the state of Illinois with respect to negligence cases involving oral surgeons. I welcome the opportunity for this court to address that issue and to reject this idea. Because it's nothing short of outrageous that this special interest group could create new rules for plaintiffs. What counsel just told us is that Dr. Burton should have said to the jury that the plaintiffs should go get an independent expert. An independent expert. That's what Burton was. Burton was not my paid expert. I did not hire Dr. Burton, go out and find him as my paid expert. He was a subsequent treating doctor. There is no greater independence than that. What they're doing is trying to create more rules. And this court should squarely reject this idea that they can do that. I would like to address, Justice Holdridge, your question about inviting the jury to palpate their own maxilla. And I would submit to the court that that is absolutely inappropriate. And here's why. There's no foundation. If they could lay a foundation that the maxilla of each of the jurors was substantially similar to Nancy Anello's, then I suppose that we could have the jurors doing their own independent investigation. And I will also say this. Page 1629 of the report of proceedings is where Dr. Panitra's backdoored in this idea and suggested to the jury, go ahead and palpate your own maxilla. And at page 1630, I objected and I moved to strike his answer. And one of the bases is relevance. It had no relevance. So not true. I objected more times, I think, in this case than I can remember in a very long time. And that's because this expert witness for the defense was a lawyer. And he testified about relevance at one point, and he was admonished by the trial court, specifically admonished by the trial court, and this is at the report of proceedings, page 1866. Do not backdoor it. Are we clear? They stated the purpose for this evidence. When they lost, they got it in through the backdoor. And I will agree with this. What the defense has done in this case is they've created a lot of confusion. They did it in the trial court, and it resulted in severe error. And the old saying goes like this, assume obfuscation, avoid confusion. Don't listen to the confusion here that they created. There's no justification for these skulls. You know, even when they're standing up here, their explanation of the skulls is they had probative value in and of themselves. And if they were such good evidence for the defense that they suggested in their closing argument, and I got this question for you, fundamental fairness. Let's have a fair fight. Just produce them during discovery. Just produce them during discovery, like every other piece of evidence. This absolutely violates any notion of fundamental fairness, that after all my experts have testified, they waltz in with skulls. And there's no question, if you look at the report of proceedings, there's no question what they did with these. They used them to undermine the x-rays. Those are all new opinions. That's what goes on. The doctor came to trial and he had an opinion. This skull shows, this skull, Exhibit 71, shows the angulation of teeth in a condition that is substantially similar to Nancy Yanello. And therefore, I can show you what the angulation of teeth is. That's a new opinion. You know what else is a new opinion? It's a new opinion that this skull, Exhibit 71, undermines the credibility of the x-rays showing impingement in the nasal palatine canal. That's a new opinion. Never disclosed. It's a new opinion that the skull somehow discredited the x-ray that showed the perforation of the maxillary sinus. New opinion. Never disclosed. You don't talk about demonstrative evidence in a closing argument. You don't tell a jury to palpate their own maxilla in a closing argument. And speaking of which, we objected to this evidence in motions in limine. We objected to the rheumatoid arthritis. The court made its decision clear in a motion in limine. I repeatedly objected to rheumatoid arthritis during this trial. I'm not required in the closing argument to object to everything that comes out of defense counsel's mouth. When the trial court has made it clear, I lost. I know how to take my losses. It's one of the things you need to do in this business. Demonstrative evidence looks like plaintiff's exhibit number 21 used by Dr. Schneider to show the maxilla and the mandible to explain terms. That's what demonstrative evidence is. And I don't think you'll see me talking about it in my closing argument. What was done in this case was profoundly prejudicial. Rheumatoid arthritis. To tell this jury that the plaintiff had a condition where her body was attacking itself. He said it seven or eight times. The trial court even commented on it. Totally inappropriate. She doesn't have rheumatoid arthritis. There was no evidence at trial that showed that Nancy Anello had rheumatoid arthritis. And I can only wonder, as the plaintiff was sitting next to me in the case, what is she thinking? What is she thinking? A dentist has now diagnosed rheumatoid arthritis that she's not being treated for. That her own physician says she doesn't have. Profoundly, profoundly prejudicial. What they did in this case was smear the plaintiff. Let's see if we can wander in all of these medical conditions. The very idea that you could have an idiopathic, which means no known cause, an idiopathic, synergic cause of implant failure. Either there is no known reason or you got one. Pick a horse. Rheumatoid arthritis, clearly a smear of the plaintiff. And no foundation at all. And never a foundation. Counsel talks about the skulls weren't exactly the plaintiff. That's not the standard. Why are we talking about things that aren't the standard? To shoo out this obfuscation. The standard is substantially similar. They never satisfied that. I could have written a better script. How to violate Charbonneau. We're asking that the court grant us a new trial. Thank you very much. Thank you, Mr. Stiglitz. Thank you both for your arguments today. We will take this matter under indictment. Back to the written disposition within a short time.